UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) HOWARD ROSENGARTEN,<br>Derivatively on Behalf of<br>CHESAPEAKE ENERGY<br>CORPORATION,<br><br>       Plaintiff,<br><br>    v.<br><br>1) AUBREY K. MCCLENDON,<br>2) MERRILL A. MILLER, JR.,<br>3) DON  NICKLES,<br>4) CHARLES T. MAXWELL,<br>5) FRANK KEATING,<br>6) RICHARD K. DAVIDSON,<br>7) V. BURNS HARGIS,<br>8) KATHLEEN M. EISBRENNER,<br>9) LOUIS A. SIMPSON,<br>10) BREENE M. KERR, and<br>11) FREDERICK B. WHITTEMORE,<br><br>      Defendants,<br><br>  – and –<br><br>12) CHESAPEAKE ENERGY<br>CORPORATION, an Oklahoma<br>corporation,<br><br>      Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.  CIV-12-505-HE<br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint

for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), Breach of

Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint")

against the defendants named herein.

## INTRODUCTION

1.     This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Chesapeake Energy ("Chesapeake" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  Plaintiff, on behalf of the Company, seeks immediate reparations and corporate governance reforms addressing the ongoing abuse of power, gross mismanagement, and disclosure violations harming the Company.

2.     Chesapeake is a natural gas producer and regularly explores for new gas reserves.  Though the Company went public in 1993, defendant Aubrey K. McClendon ("McClendon"), one of the Company's co-founders and current Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board"), has continued to treat it as his private company.  Most recently, McClendon took part in a "well participation program," available only to the Company's founders known as the Founder Well Participation Program ("FWPP").  This program allowed McClendon to personally participate in the Company's exploratory efforts, and to seek monetary benefits from his investments.

3.     The Board repeatedly reassured shareholders that the FWPP aligned the interests of the founders with those of the Company because the founders were investing, and sharing the "risks" and rewards of drilling, on the same basis as the Company.  The Board touted that such participation encouraged the founders to make decisions that would benefit the Company and its shareholders.

4.      Defendant McClendon, however, crafted a scheme in which he would reap the personal profits of the Company's exploratory efforts but avoid the risk that justified shareholder approval of the FWPP in the first place.  From at least 2009 to 2012, McClendon did not contribute his own cash or assets to pay for his share of the Company's wells.  Instead, he used loans secured by his 2.5% interest in others wells that he acquired through the FWPP to further invest in the Company's exploratory efforts. McClendon pledged almost his entire interest in these wells as collateral that would be seized if he defaulted on the loans.  In June 2009, McClendon agreed to borrow up to $225 million.  In December 2010, he borrowed another $375 million. Finally in January 2012, McClendon borrowed an additional $500 million.

5.      The Board breached its fiduciary duties by failing to police defendant McClendon's massive loans, which violated the FWPP and were not in the Company's best interests.  Such massive loans raise serious conflicts of interest because they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with creditors on financing terms.  In addition, McClendon's loans are secured by the various wells in which he has interests, and as such, may adversely impact Chesapeake and its business should they fall into default.  Finally, McClendon's massive loans call into question whether the FWPP's stated goal of aligning McClendon's financial interests with those of the shareholders (as was promised when the FWPP was officially approved by shareholders in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments.

6.    Moreover, the Board caused Chesapeake to file annual Proxy Statements with the U.S. Securities and Exchange Commission ("SEC") on Forms DEF 14A that misrepresented and failed to apprise shareholders of certain material information concerning defendant McClendon's participation in the FWPP, the alignment of his interests with the Company's interests, and his risk in participating in the FWPP. Chesapeake has been damaged by the materially misleading statements and omissions in the Proxy Statements between 2009 and the present, which procured the authorization of the Company's undeserved Long Term Incentive Program ("LTIP") and rewarded the Company's wayward fiduciaries.

7.    The nature and extent of defendant McClendon's abusive investment strategy was concealed from the public until an article published by *Reuters* on April 18, 2012, exposed the underlying breaches of duty harming the Company.  The *Reuters* article revealed that McClendon had secured up to $1.1 billion in loans to enable him to invest in the FWPP, including as much as $500 million from EIG Global Energy Partners ("EIG"), a private equity firm heavily involved in financial dealings with Chesapeake overseen by McClendon.

8.    The consensus among the academics, attorneys, and analysts *Reuters* worked with, who personally reviewed the loan transactions, is that Chesapeake should have fully disclosed the details of defendant McClendon's loan transactions.  For example, David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, opined that, "[g]iven the size, scope and complicated terms of the loans, their particulars constitute important stockholder information and therefore should

be more fully disclosed." Similarly, Joseph Allman, an oil and gas industry analyst at JPMorgan who reviewed the loan agreements, said, "I think the company should disclose this information. One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing to Chesapeake. In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO."

9.     In the wake of the April 18, 2012 revelations, Chesapeake's market capitalization plummeted more than $500 million, or 5.5%, in one day. Chesapeake is now subject to a securities class action lawsuit filed in the United States District Court for the Western District of Oklahoma. In addition, the SEC has opened an informal inquiry into Chesapeake's FWPP.

10.     In light of these facts alleged herein, plaintiff, on behalf of Chesapeake, respectfully requests that the Court: (i) order that the FWPP is invalid and that defendant McClendon is prohibited from further participating in the program; (ii) direct the Individual Defendants (as defined herein) to disclose all material facts relating to McClendon's loans relating to his participation in the FWPP; (iii) order that the Individual Defendants pay damages they proximately caused to the Company through their breaches of fiduciary duty; and (iv) grant the other relief requested in this Complaint.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections

14(a) and 20(a) of the Exchange Act.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Chesapeake maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## RELEVANT PARTIES INVOLVED

**Plaintiff**

14.     Plaintiff Howard Rosengarten was a shareholder of Chesapeake at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Chesapeake shareholder.

**Nominal Defendant**

15.     Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.  The Company's principal executive offices are located at 6100 North Western Avenue, Oklahoma City, Oklahoma. Chesapeake's shares trade on the New York Stock Exchange.  Chesapeake is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

16.     Defendant McClendon is Chesapeake's Chairman of the Board, CEO, and a director and has been since 1989.   McClendon co-founded Chesapeake in 1989. McClendon secured massive loans to participate in the FWPP, in violation of the intended purpose of the program and the Company's best interests.   Moreover, McClendon at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with his participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning his interests with the Company, in at least one Proxy Statement filed by the Company.  Chesapeake paid McClendon the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $975,000 | $1,951,000 | $3,627,556 | $1,314,520 | $7,868,076 |
| 2010 | $975,000 | $1,951,000 | $16,804,500 | $1,314,452 | $21,044,952 |
| 2009 | $975,000 | $1,951,000 | $14,049,200 | $1,576,096 | $18,551,296 |

17.     Defendant Merrill A. Miller, Jr. ("Miller") is Chesapeake's Lead Independent Director and has been since March 2010 and a director and has been since January 2007.  Miller is also a member of Chesapeake's Audit Committee and has been since March 2007.  Miller at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.  Miller's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $150,000 | $267,771 | $154,938 | $572,709 |
| 2010 | $139,500 | $305,125 | $163,324 | $607,949 |
| 2009 | $129,000 | $287,250 | $107,522 | $523,772 |

18.     Defendant Don Nickles ("Nickles") is a Chesapeake director and has been since January 2005.  Nickles was also a member of Chesapeake's Audit Committee from March 2005 to December 2008.  Nickles at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy

Statement filed by the Company. Nickles' materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power. Chesapeake paid Nickles the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $153,500 | $247,772 | $168,069 | $569,341 |
| 2010 | $146,500 | $305,125 | $138,691 | $590,316 |
| 2009 | $136,000 | $287,250 | $131,437 | $554,687 |

19.     Defendant Charles T. Maxwell ("Maxwell") is a Chesapeake director and has been since 2002. Maxwell is also a member of Chesapeake's Compensation Committee and has been since March 2007. Maxwell was a member of Chesapeake's Audit Committee from at least April 2004 to March 2007 and a member of the Compensation Committee from at least April 2004 to March 2005. Maxwell at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company. Maxwell's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power. Chesapeake paid Maxwell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $153,500 | $247,772 | $157,960 | $559,232 |
| 2010 | $146,500 | $305,125 | $15,401 | $467,026 |
| 2009 | $129,000 | $287,250 | $1,232 | $417,482 |

20.     Defendant Frank Keating ("Keating") is a Chesapeake director and has been since June 2003. Keating is also Chairman of Chesapeake's Compensation Committee and has been since at least April 2011 and a member of that committee and

has been since at least March 2005.  Keating was a member of Chesapeake's Audit Committee from at least April 2004 to March 2005.  Keating at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.  Keating's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Keating the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $153,500 | $247,772 | $157,960 | $559,232 |
| 2010 | $143,000 | $305,125 | $175,318 | $623,443 |
| 2009 | $117,500 | $287,250 | $125,988 | $530,738 |

21.     Defendant Richard K. Davidson ("Davidson") is a Chesapeake director and has been since March 2006.  Davidson is also a member of Chesapeake's Audit Committee and has been since March 2006.  Davidson at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.  Davidson's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Davidson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $153,500 | $232,773 | $204,153 | $590,426 |
| 2010 | $146,500 | $305,125 | $168,813 | $620,438 |
| 2009 | $136,000 | $287,250 | $142,350 | $565,600 |

22.     Defendant V. Burns Hargis ("Hargis") is a Chesapeake director and has been since September 2008.  Hargis is also Chairman of Chesapeake's Audit Committee and has been since at least April 2010 and a member of that committee and has been since September 2008.  Hargis at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.   Hargis' materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.   Chesapeake paid Hargis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $153,500 | $257,771 | $154,194 | $565,465 |
| 2010 | $146,500 | $305,125 | $128,626 | $580,251 |
| 2009 | $136,000 | $287,250 | $119,516 | $542,766 |

23.     Defendant Kathleen M. Eisbrenner ("Eisbrenner") is a Chesapeake director and has been since December 2010.  Eisbrenner is also a member of Chesapeake's Compensation Committee and has been since at least April 2011.  Eisbrenner at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.  Eisbrenner's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Eisbrenner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $154,583 | $232,773 | $174,449 | $561,805 |
| 2010 | $23,083 | $214,100 | $11,487 | $248,670 |

24.     Defendant Louis A. Simpson ("Simpson") is a Chesapeake director and has been since June 2011.  Simpson at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.   Simpson's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.   Chesapeake paid Simpson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $93,173 | $525,173 | $29,392 | $647,738 |

25.     Defendant Breene M. Kerr ("Kerr") was a Chesapeake director from 1993 to June 2009.  Kerr was also Chairman of Chesapeake's Audit Committee from at least April 2004 to June 2009.  Kerr at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.   Kerr's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Kerr the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | All Other Compensation | Total |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 2009 | $71,500 | $640,834 | $712,334 |

26.     Defendant Frederick B. Whittemore ("Whittemore") was a Chesapeake director from 1993 to June 2011.  Whittemore was also Chairman of Chesapeake's Compensation Committee from at least April 2004 to at least April 2010 and a member of that committee from at least April 2004 to at least April 2011.  Whittemore at least negligently made or caused improper statements concerning the: (i) nature of the financing arrangements made in connection with defendant McClendon's participation in the FWPP; and (ii) purpose of the FWPP as it related to aligning McClendon's interests with the Company, in at least one Proxy Statement filed by the Company.  Whittemore's materially inaccurate Proxy Statements perpetuated McClendon's rampant abuse of power.  Chesapeake paid Kerr the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $75,000 | $219,300 | $51,178 | $345,478 |
| 2010 | $146,500 | $305,125 | $25,443 | $477,068 |
| 2009 | $136,000 | $287,250 | $52,376 | $475,626 |

27.     The defendants identified in ¶¶16-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶17-22, 25 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶19-20, 23, 26 are referred to herein as the "Compensation Committee Defendants."  Collectively, the defendants identified in ¶¶16-26 are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

28.     The Individual Defendants owed and owe Chesapeake fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to

control and manage Chesapeake in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, the Individual Defendants are also required to disclose fully and fairly all material information within their control when they seek shareholder action.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Chesapeake were required to, among other things:

(i)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner and provide the highest quality of performance;

(ii)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and

state laws, rules, and regulations, and all contractual obligations, including acting only within the scope of its legal authority;

(iii)    ensure that the purposes and goals of the Company's FWPP are served at all times and are not compromised in order to serve the interests of any of Chesapeake's executive officers;

(iv)    ensure that the Company not waste its corporate assets by conferring personal benefits on its executives or other employees, with no corresponding benefit to the Company; and

(v)    ensure that the Board and any of its committees, including the Compensation Committee and Audit Committee, fulfill their respective duties, including by ensuring that the Board and its committees become reasonably informed before making any decisions on the Company's behalf.

32.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Chesapeake, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Chesapeake's Board.

33.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or

design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FURTHER SUBSTANTIVE ALLEGATIONS

## BACKGROUND OF CHESAPEAKE AND THE FWPP

35.   According to the Company's April 2012 investor presentation, Chesapeake is the second largest producer of natural gas in the United States and purportedly the most active driller of new wells.   The Company owns interests in nearly 40,000 natural gas and oil-producing wells that are currently producing more than 2 billion cubic feet of natural gas equivalent per day.   Chesapeake's strategy is to discover, acquire, and develop conventional and unconventional natural gas reserves.   Defendant McClendon co-founded Chesapeake in 1989, with non-defendant Tom L. Ward.

36.   Since the Company's initial public offering ("IPO") in 1993, defendant McClendon has participated in a "well participation program," available only to the Company's founders.   FWPP allowed McClendon to personally participate in the

Company's exploratory efforts and to seek personal benefits from that participation in addition to the benefits he obtained by serving as Chesapeake's lead executive.

37.     The Board repeatedly assured investors that the FWPP aligned the interests of the founders with those of the Company because the founders were investing, and sharing the risks and rewards of drilling, on the same basis as the Company.   The directors touted that such participation encouraged the founders to make decisions that would benefit the Company and its public shareholders.

38.     For each well in which a founder participated, the Company or other operator billed the founder an amount equal to his participation percentage multiplied by the drilling and operating costs incurred in drilling the well, together with leasehold costs in an amount determined by the Company to approximate the Company's average cost in all of the Company's acreage.   Payment was due for such costs promptly upon receipt of an invoice.   The founder would also receive a proportionate share of revenue from the well, less certain charges by the Company for marketing the oil and natural gas production.   The terms of the founders' participation were represented to be no better than third-party participants' terms in the wells.

39.     While the FWPP was not officially approved by shareholders until June 10, 2005, the FWPP was a continuation of a well participation program that was initiated with Chesapeake's IPO in 1993 for its two founders, including defendant McClendon.

40.     When shareholders were asked to approve the FWPP in 2005, they were told in Chesapeake's April 29, 2005 Proxy Statement ("2005 Proxy") that the purpose of the FWPP was to align the interests of defendant McClendon and his co-founder with

those of the Company.  Per the 2005 Proxy and the terms of the FWPP itself, the purpose

of the FWPP is to foster and promote the development and execution of the Company's

business by: (i) retaining and motivating the principal executive officers who founded the

Company; (ii) *aligning the financial rewards and risks of the founders* with the

Company more effectively than overriding royalty, carried interest, or other performance

incentive programs maintained by many of the Company's peers; and (iii) *imposing on*

*the founders the same risk incurred by the Company in its core operations*.

41.    To encourage shareholders to vote to approve the FWPP, the Company

presented the program's benefits as follows:

- Since the long-term success of the Company is dependent on its ability to conduct oil and gas exploration and production profitability, the participation program *instills discipline in the Company's long-term strategy by imposing risks on the Founders which are identical to the risks incurred by the Company*.

- The Company's stock price fluctuates based on many industry-related factors that are not within the control of our management, including volatility of oil and gas prices and global supply/demand trends for natural resources.  The participation program provides an additional mechanism for providing direct incentives to the Founders to create long-term value through the efficient development of the Company's resource base.

- Our founders are personally and professionally *incentivized to maintain their focus on the growth, success, and profitability of the Company's operations since such operations have a direct impact on the Founders*.

42.    The terms of the FWPP provide that a founder who participates in the

program for a particular participation period agrees to pay all joint billings "immediately

on receipt of the Company's invoice" and agrees to prepay to the Company amounts

attributable to the founder's interest to the extent a Company entity is required to prepay costs in connection with a well spudded during that participation period. The 2005 Proxy reinforced these terms in greater detail:

> For each well in which a Founder participates, *the Company will bill the Founder, on a monthly basis,* an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well. Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. *Payment is due for all such costs promptly upon receipt of an invoice.*

## THE INDIVIDUAL DEFENDANTS' FAILURE TO POLICE DEFENDANT MCCLENDON'S MASSIVE LOANS IN VIOLATION OF THE FWPP AND THE COMPANY'S BEST INTERESTS

43.     Defendant McClendon's personal financial issues have, in the past, been of great concern to shareholders, and have had an adverse effect on the Company's stock. To increase his holdings in Chesapeake stock, McClendon borrowed money from his brokers, a practice known as buying on margin.   In October 2008, with stock prices imploding, McClendon was forced to sell more than thirty-one million Chesapeake shares for $569 million to cover margin calls from his brokers.  The Company's stock fell nearly 40% the week of McClendon's sales.  McClendon issued an apology but the Company's credibility with many shareholders suffered significantly. Shareholder lawsuits arising from these events settled with a payment to the Company by McClendon, and certain new governance provisions that discourage speculative stock transactions in Chesapeake stock by Chesapeake executives.

44.    In the wake of the events of 2008, McClendon sought a new (yet undisclosed) method of financing his speculations.   From at least 2009 to 2012, McClendon did not contribute his own cash or assets to pay for his share of the Company's wells.  Instead, he used loans secured by his 2.5% interest in others wells that he acquired through the FWPP.  McClendon pledged almost his entire interest in these wells as collateral that would be seized if he defaulted on the loans.  In June 2009, McClendon agreed to borrow up to $225 million.   In December 2010, he borrowed another $375 million. Finally in January 2012, McClendon borrowed an additional $500 million.

45.    Instead of aligning his interests with that of the Company, however, defendant McClendon gave EIG, the entity McClendon used to borrow the $500 million from, the benefits of participating in the Company's wells.

46.    There is a grave risk that defendant McClendon's over-leveraging of his well interests will negatively impact Chesapeake.  According to *Reuters*, these loans required McClendon to *"'take all commercially reasonable action' to ensure that other owners and operators of the wells – including Chesapeake – 'comply with ... covenants and agreements' of the loans."*  Thomas O. Gorman, a partner at Dorsey & Whitney in Washington, D.C., commented that, because of this clause, these private loans had the potential to adversely impact Chesapeake.

47.    Such huge loans raise serious conflicts of interest: they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with EIG on

financing terms.  Indeed, upon revelation of the loans, some analysts opined that EIG's investors have received favorable terms from Chesapeake on recent financing deals.  In addition to the above, loans of such magnitude, which are secured by defendant McClendon's interest in the various wells in which he has interests, may adversely impact Chesapeake and its business should they fall into default.  Finally, McClendon's massive loans call into question whether the FWPP's stated goal of aligning the financial interests of McClendon with those of the shareholders (as was promised when the FWPP was approved in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments.

48.    According to academics and analysts interviewed for the *Reuters* article, Chesapeake should fully disclose the details of defendant McClendon's loan transactions. David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, said that given the size, scope, and complicated terms of the loans, the details of these transactions are key information for shareholders to have in evaluating the Company and, thus, they should be fully disclosed.  Mike Bread, an oil and gas research analyst at Hodges Capital Management in Dallas, a company that owns Chesapeake shares, agreed that the loans should be disclosed, citing the facts that they are large and related to the oil and gas business.  Other analysts seeking disclosure cited the potential conflict created by the fact that McClendon's largest source of loans, EIG, is also an investor in Chesapeake.  Joseph Allman, an oil and gas industry analyst at JPMorgan in New York, reviewed the loan agreements and concluded that the Company should

disclose the details of the loan transactions because of the potential for a conflict with EIG.

49.     As explained by *Reuters*, key aspects of McClendon's loans remain hidden from shareholders.  For example, the Company's Proxy Statements do not disclose the number, amounts, or terms of defendant McClendon's loans.

## MISLEADING PROXY STATEMENTS

50.     The Individual Defendants caused Chesapeake to file annual Proxy Statements with the SEC on Forms DEF 14A that failed to disclose material information concerning defendant McClendon's participation in the FWPP.  Each Proxy Statement between 2009 and the present was signed "By Order of the Board of Directors."  The Individual Defendants were members of the Board during the issuance of one or more of these Proxy Statements, and as such, approved and made said statements, which were provided to shareholders in connection with soliciting their votes.

51.  Each Proxy Statement between 2009 and the present contained false or misleading statements or omissions of material facts regarding, among other things: (i) the purpose of the FWPP as it related to aligning defendant McClendon's interests with the Company; and (ii) the nature and extent of defendant McClendon's financing arrangements made in connection with his participation in the FWPP.

52.     In the Company's May 4, 2009 Proxy Statement, for example, defendants McClendon, Davidson, Hargis, Keating, Kerr, Maxwell, Nickles, Whittemore, and Miller further told shareholders that "the Board tailored a specific award that ***aligned***

*[McClendon's] interests with the Company and put him at risk if the Company drilled poor wells.*"

53.     The statements issued in the Proxy Statements were false and misleading because they omitted the fact that defendant McClendon was not truly facing the same risks as the Company. McClendon's interests are not actually aligned with the Company because his participation in the FWPP is being funded by his massive loans. As a result, unlike the Company, McClendon faces minimum risk.

54.     Chesapeake has been damaged by the materially misleading statements and omissions in the Proxy Statements between 2009 and the present. Each of the Proxy Statements from 2009 to 2012 contained a proposal to increase the amount of shares available to compensate employees through the LTIP. The Individual Defendants continued their practice of asking for amendments to increase the shares available under this plan every year since its inception. The LTIP amendments passed each year from 2009 to 2011.

55.     Had the shareholders had complete information regarding the true nature of defendant McClendon's participation in the FWPP, they would not have voted to increase his compensation. On the contrary, shareholders would have voted against the increases to payouts under the LTIP.

56.     Accordingly, Chesapeake has been damaged by the materially misleading statements and omissions in the Proxy Statements between 2009 and the present that procured the authorization of the undeserved LTIP rewarding the Company's wayward fiduciaries.

## DAMAGES CAUSED BY THE INDIVIDUAL DEFENDANTS

57.     As a result of the Individual Defendants' improprieties, Chesapeake disseminated improper, public statements concerning, among other things, defendant McClendon's participation in the FWPP.  These improper statements have devastated Chesapeake's credibility.  In the wake of the April 18, 2012 revelations, Chesapeake's market capitalization plummeted more than $500 million, or 5.5%, in one day. Chesapeake is now subject to a securities class action lawsuit filed in the United States District Court for the Western District of Oklahoma.  In addition, the SEC has opened an informal inquiry into Chesapeake's FWPP.

58.     As a direct and proximate result of the Individual Defendants' actions, Chesapeake has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to: (i) costs incurred from defending the securities class action lawsuit; (ii) costs incurred from a potential adverse judgment or settlement in the securities class action lawsuit; (iii) costs incurred from cooperating with the SEC inquiry into the FWPP; and (iv) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Chesapeake, including those relating to the undeserved LTIP.

## DEMAND WOULD BE FUTILE

59.     Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress injuries suffered, and to be suffered, by Chesapeake as a direct result of violations of the Exchange Act, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual

Defendants.  Chesapeake is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

60.    Plaintiff will adequately and fairly represent the interests of Chesapeake in enforcing and prosecuting its rights.

61.    Plaintiff was a shareholder of Chesapeake at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Chesapeake shareholder.

62.    The current Board of Chesapeake consists of the following nine (9) individuals:  defendants  McClendon,  Hargis,  Miller,  Davidson,  Nickles,  Keating, Maxwell, Simpson, and Eisbrenner.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be futile.

63.    Defendant McClendon secured massive loans to participate in the FWPP, in violation of the intended purpose of the program and the Company's best interests. Moreover, McClendon is named as a defendant in the companion securities class action lawsuit that was filed in the United States District Court for the Western District of Oklahoma for his improper statements regarding the nature of his participation in the FWPP.  As a result, McClendon faces a substantial likelihood of liability, rendering a pre-suit demand on him futile.

64.    Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson at least negligently made or caused improper statements in one or more of the Company's Proxy Statements in connection with soliciting

shareholder votes regarding the FWPP and the LTIP amendments. As a result, a pre-suit demand on McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson is futile.

65.     Defendants Davidson, Hargis, and Miller, as members of the Audit Committee, reviewed and approved the improper statements issued in the Company's filings with the SEC. The Audit Committee Charter provides that the committee is responsible for, among other things, overseeing the Company's financial reporting and discussing with management: (i) the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures; and (ii) the guidelines and policies to govern the process by which risk assessment and risk management is undertaken. The Audit Committee's Charter further provides that the Audit Committee is responsible for oversight of legal, regulatory, and compliance matters. The Audit Committee Defendants were specifically tasked with reviewing insider or affiliated party transactions or courses of dealing and related disclosures in the Company's annual proxy statement. Thus, Davidson, Hargis, and Miller knowingly or recklessly allowed the improper statements regarding the true nature and extent of McClendon's financing relating to his participation in the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements. Accordingly, Davidson, Hargis, and Miller face a substantial likelihood of liability for their breach of fiduciary duties. As a result, demand upon Davidson, Hargis, and Miller is futile.

66.     Similar to the Audit Committee Defendants, defendants Eisbrenner, Keating, Maxwell, and Whittemore, as members of the Compensation Committee, reviewed and approved the improper statements issued in the Company's filings with the SEC.  The Compensation Committee's Charter requires the Compensation Committee to "review compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the [FWPP]."  As a result of these responsibilities, Eisbrenner, Keating, Maxwell, and Whittemore are aware of the nature of defendant McClendon's financing in connection with the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interests arising from McClendon's financing arrangements.  Despite their knowledge, or with reckless disregard, Eisbrenner, Keating, Maxwell, and Whittemore caused the Company to issue improper statements relating to those material issues. Accordingly, Eisbrenner, Keating, Maxwell, and Whittemore face a substantial likelihood of liability for their breach of fiduciary duties rendering any demand upon them futile.

67.     Finally, the entire current Board, made up of defendants McClendon, Hargis, Miller, Davidson, Nickles, Keating, Maxwell, Simpson, and Eisbrenner, failed to implement adequate internal controls to police defendant McClendon's massive loans, which violated the FWPP and were not in the Company's best interests.

68.     Chesapeake has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for

that wrongful conduct to attempt to recover for Chesapeake any part of the damages Chesapeake suffered and will suffer thereby.

69.     Plaintiff has not made any demand on the other shareholders of Chesapeake to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Chesapeake is a publicly held company with over 664 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a)
### of the Exchange Act

70.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71.     The Individual Defendants knowingly, recklessly, or with gross negligence caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's 2009, 2010, 2011, and 2012 Proxy Statements.

72.     Each of the Proxy Statements from 2009 to 2012 contained a proposal to increase the amount of shares available to compensate employees through the Company's

LTIP.   Had the shareholders had complete information regarding the true nature of defendant McClendon's participation in the FWPP, they would not have voted to increase his compensation.

73.    Plaintiff, on behalf of Chesapeake, thereby seeks relief for damages caused by the improper approval of the LTIP compensation increases in 2009, 2010, and 2011.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

74.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.    The Individual Defendants acted as controlling persons of Chesapeake within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Chesapeake, and by their participation in and/or awareness of the Company's operations and/or their knowledge of the false statements contained in the 2009, 2010, 2011, and 2012 Proxy Statements filed with the SEC, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements or omissions.

76.    The Individual Defendants were provided with, or had unlimited access to, the 2009, 2010, 2011, and 2012 Proxy Statements containing the misleading statements or omissions prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

77.    By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

78.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Chesapeake will be irreparably harmed.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

79.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.    The Individual Defendants owed and owe Chesapeake fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Chesapeake the highest obligation of good faith, fair dealing, loyalty, and due care.

81.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  The Individual Defendants failed to implement adequate internal controls to police defendant McClendon's massive loans, which violated the FWPP and were not in the Company's best interests.

82.    Director Defendants McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson, as directors of the Company, owed Chesapeake the highest duty of loyalty.  McClendon, Davidson, Hargis, Keating, Maxwell, Nickles, Miller, Eisbrenner, and Simpson knew or were reckless in not knowing that: (i) McClendon's massive private loans violated the FWPP and the

Company's best interests; and (ii) the 2009, 2010, 2011, and 2012 Proxy Statements contained misleading statements or omissions in violation of the Exchange Act.

83.     Audit Committee Defendants Davidson, Hargis, and Miller breached their fiduciary duty of loyalty by reviewing and approving the improper statements alleged herein.

84.     The Compensation Committee Defendants, Eisbrenner, Keating, Maxwell, and Whittemore, breached their fiduciary duty of loyalty by failing to police defendant McClendon's compliance with the FWPP.  Furthermore, despite their knowledge, or with reckless disregard, Eisbrenner, Keating, Maxwell, and Whittemore caused the Company to issue improper statements relating to the nature of McClendon's financing in connection with the FWPP, the lack of alignment of McClendon's interests with those of the Company, as well as actual and potential conflicts of interest arising from McClendon's financing arrangements.

85.     Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Chesapeake.  Defendant McClendon was unjustly enriched by securing massive loans to participate in the FWPP, in violation of the intended purpose of the program and the Company's best interests.

The rest of the Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Chesapeake.

88.     Plaintiff, as a shareholder and representative of Chesapeake, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

89.     Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Chesapeake, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies: (1) a proposal to establish a method of independent oversight regarding defendant McClendon's borrowings, such that the threats they may represent to the Company can be identified and addressed; (2) a proposal to rescind the

FWPP; (3) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (4) a provision to permit the shareholders of Chesapeake to nominate at least three candidates for election to the Board; and (5) a proposal to strengthen Chesapeake's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting their assets so as to assure that plaintiff on behalf of Chesapeake has an effective remedy;

D.      Awarding to Chesapeake restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 3, 2012

DERRYBERRY & NAIFEH, LLP
DARREN B. DERRYBERRY


S/  Darren B. Derryberry, OBA No. 14542

4800 North Lincoln Boulevard
Oklahoma City, OK 73105
Telephone: (405) 528-6569
Facsimile:  (405) 528-6462
dderryberry@derryberrylaw.com

LAW OFFICES OF CURTIS V. TRINKO
CURTIS V. TRINKO
(Pending Pro Hoc Vice)
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158

Attorneys for Plaintiff

725292

## VERIFICATION

I, Howard Rosengarten, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Violations of the Securities and Exchange Action of 1934, Breach of Fiduciary Duty, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 4/30/2012

HOWARD ROSENGARTEN